1
2
3
4                         UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    RAJINA SCHLITT,                          Case No. 15-cv-01369-WHO
                     Plaintiff,
8                                             **ORDER DENYING MOTION FOR
         v.                                   SUMMARY JUDGMENT**
9
     ABERCROMBIE & FITCH STORES, INC.,        Re: Dkt. No. 28
10
                     Defendant.
11

12                              **INTRODUCTION**

13           Plaintiff Rajina Schlitt is a Seventh-day Adventist who believes that the Sabbath, from

14   sundown Friday to sundown Saturday, is a religious day on which to refrain from secular work.

15   She brings this religious discrimination case against her former employer, defendant Abercrombie

16   & Fitch Stores, Inc. ("Abercrombie"), alleging that Abercrombie terminated her because it was no

17   longer willing to accommodate her observance of the Sabbath, in violation of Title VII of the Civil

18   Rights Act ("Title VII") and California's Fair Employment and Housing Act ("FEHA").

19           Abercrombie moves for summary judgment.  It does not argue that Schlitt's observance of

20   the Sabbath fails to qualify as a protected religious practice, nor that reasonably accommodating

21   this practice caused undue hardship.  It contends that the evidence establishes that it terminated

22   Schlitt because it had a good faith and reasonable belief that Schlitt allowed a nonemployee into

23   the back room of the store in violation of company policy and then lied about the incident to her

24   supervisor, not because of her religious accommodation.  Because I find that there are triable

25   issues regarding Abercrombie's motivations for terminating Schlitt, the motion is DENIED.

26                              **BACKGROUND**

27   **I.     FACTUAL BACKGROUND**

28           Schlitt brings four causes of action against Abercrombie: (1) religious discrimination in

United States District Court
Northern District of California

violation of FEHA; (2) retaliation in violation of FEHA; (3) religious discrimination in violation of Title VII; and (4) retaliation in violation of Title VII.  Compl. ¶¶ 68-114 (Dkt. No. 1).  Each of her claims arises from her allegedly discriminatory/retaliatory termination from Abercrombie in 2010.[1]  *See id.*  She asserts that her termination was motived by her association with the Seventh-day Adventist Church and, more specifically, her observance of the Sabbath, from sundown Friday to sundown Saturday, as a day to refrain from secular work.

It is undisputed that Abercrombie knew of and accepted this religious accommodation when Schlitt was initially hired and during the majority of her employment.  According to Schlitt, however, there is sufficient evidence for a jury to reasonably conclude that Abercrombie ultimately decided to terminate her because her accommodation "had become too much trouble." Oppo. at 12, 15 (Dkt. No. 31).  According to Abercrombie, the record establishes that it terminated Schlitt because it had a "good faith and reasonable belief" that she allowed a nonemployee into the back room of the store in violation of company policy and then lied about the incident to her supervisor.  Mot. at 10 (Dkt. No. 28).

### A.    Schlitt's Hiring and Promotions

Abercrombie initially hired Schlitt as a manager in training at a store in Riverside, California, in May 2006.  Schlitt Depo. at 23-24, 43-44 (McCormick Decl. Ex. A, Dkt. No. 28-2; Reinach Decl. Ex. H, Dkt. No. 31-3).  When interviewing for this position, Schlitt notified Abercrombie that, due to her religious beliefs, she would not be able to work on the Sabbath.  *Id.* at 65-67.  Her interviewer agreed to the accommodation, although, according to Schlitt, he also noted that "it's tough because [the Sabbath is] a time when, you know, a lot of people, you know, want off, you know, and typically, you know, people work through, you know, the weekend." *Id.* at 66-67.  He told her that she should "be very nice to people." *Id.*

In August 2006, Schlitt was promoted from manager in training to assistant manager.

---

[1] It is unclear whether Schlitt means to bring discrimination claims based on Abercrombie's denial of her request to transfer in addition to discrimination claims based on her termination.  Her retaliation claims are clearly limited to her termination, *see* Compl. ¶¶ 87, 110, but it is unclear whether her discrimination claims are also limited in this way, *see id.* ¶¶ 75, 98 (alleging that Schlitt was "denied transfer and targeted for termination").  Because this issue is not material to the resolution of this motion, I do not address it at this time.

Schlitt Depo. at 44.  After approximately one year at the Riverside store, she asked to be transferred to a San Jose store.  *Id.* at 45.  Abercrombie granted the request and transferred her to a store at Eastridge in San Jose.  *Id.* at 47-48.  After four or five months at the Eastridge store, Schlitt was transferred to a higher-volume store at Valley Fair, on the border of San Jose and Santa Clara.  *Id.* 48-49.  This transfer occurred because Schlitt was performing well; although she maintained her assistant manager title, the transfer was considered a promotion given that it was to a higher-volume store.  *Id.* at 93.  In March 2008, Abercrombie promoted Schlitt again, this time to a store manager position at a store in Santa Rosa.  *Id.* at 50.

### B.     First Loss Prevention Policy Violation

In April 2009, Schlitt received an "Unsatisfactory Performance Notice" for allowing her boyfriend (a nonemployee) into the back room of the Santa Rosa store.  Schlitt Depo. at 184, 186, Ex. 13.  The notice identifies the "Issue" as "Poor Judgment" and includes the following description of the unsatisfactory performance:

> It has been brought to my attention that on several occasions Rajina has had her boyfriend, who is not an associate of the company, in the store while it is not open, as well as in the back, in the office. As the store manager Rajina must make sure she is setting [an] example and not allowing people who are not employed by [Abercrombie] in the store while it is not open or in the back, in the office, in order to ensure all associates feel comfortable and safe.

*Id.* at Ex. 13.  The notice also discusses the importance of exercising "good judgment" and states that "[f]ailure to meet these expectations can lead to additional disciplinary action up to and including possible termination of employment."  *Id.*  Schlitt electronically signed the notice and recalls having a conversation with her district manager about it.  *Id.* at 188-89.

Abercrombie states that "[o]ne of [its] most basic loss prevention policies is that nonemployees are prohibited from the back room of the store."  Mot. at 3.  In a section titled, "Loss Prevention Store Policies," Abercrombie's "Associate Handbook" states, "No one, other than . . . associates currently scheduled by management and working on the clock, is permitted anywhere in the store (including in the back stock room of the store) before or after hours. Associates not on the clock are NOT permitted to be or remain in the store or in the back room of the store unless approved by a supervisor."  Associate Handbook at CSC 000026 (Oppo. Ex. 5)

United States District Court
Northern District of California

1  (capitalization as in original).  The Associate Handbook also provides that "[n]o person, other than

2  associates, shall be permitted in non-sales areas unaccompanied . . . [A]ssociates may not receive

3  visitors in non-sales areas."  *Id.*  Finally, in another section titled, "Do's and Don'ts Associated

4  with External Theft Prevention," the Associated Handbook instructs: "Do Not – Allow

5  unauthorized personnel in the back room.  Friends of associates are not permitted in non-sales

6  areas."  *Id.* at CSC 000030.

7        Schlitt admitted at her deposition that loss prevention is "one of the critical job functions"

8  of a store manager and "a point of emphasis" for Abercrombie.  Schlitt Depo. at 115, 241.  She

9  also admitted that, as a store manager, she was responsible for "enforcing the policies and

10 procedures" set forth in the Associate Handbook.  *Id.* at 82, 191.

11     **C.**      **Second Loss Prevention Policy Violation**

12       In December 2009, approximately eight months after the Unsatisfactory Performance

13 Notice, an assistant manager notified Schlitt that a nonemployee, a former manager in training

14 from the Santa Rosa store named Messan Arnaud Lawson, was in the back room waiting to see

15 Schlitt.  Schlitt Depo. at 164-66.  Schlitt did not have plans with Arnaud and did not know that he

16 would be stopping by the store that day.  *Id.* at 168-69.  Schlitt testified that she was on a

17 conference call at the time she was notified, and that she told the assistant manager to have Arnaud

18 leave the backroom.  *Id.* at 165.  Schlitt then "assum[ed] that [Arnaud] [had been] asked to leave,"

19 and, after finishing her conference call, went to the backroom, where she found Arnaud sitting on

20 a stool, speaking with another store employee, Kenneth Hilger.  *Id.* at 167.  Schlitt said, "Hey,

21 come on, let's go, you can't be back here," and she and Arnaud left the store and went out to

22 dinner to catch up.  *Id.* at 167, 169.

23       Schlitt did not report Arnaud's presence in the backroom, despite knowing that it was a

24 violation of Abercrombie's loss prevention policies.  *Id.* at 186-86, 192.  However, assistant

25 manager Lauren McHugh reported the incident to Human Resources on January 13, 2010.

26 McHugh Depo. at 37 (McCormick Decl. Ex. D, Dkt. No. 28-4); Oppo Ex. 15.  Although Schlitt

27 previously remembered Marissa McCollum as the assistant manager who notified her that Arnaud

28 was in the back room, *see, e.g.,* Schlitt Depo. at 165, it is now undisputed that the assistant

United States District Court
Northern District of California

manager was actually McHugh.  At her deposition, McHugh recalled telling Human Resources "[j]ust that someone was in the back room, and it was just kind of awkward for me, but everyone else seemed to know who he was, and I didn't know who he was, and he was waiting for Rajina." McHugh Depo at. 37.  According to the Human Resources record from the incident, McHugh reported that Schlitt had "allowed a male nonemployee to enter the stockroom intermittently from 5 p.m. to 6 p.m.," and that McHugh thought that the nonemployee's name was "Anwar."  Oppo. Ex. 15.  The record continues:

> McHugh . . . asked Schlitt why . . . Anwar was in the stockroom, and asked if Schlitt would ask him to leave.  Schlitt was working on the computer and replied, "Well, you can ask him to leave." McHugh then said, "Well I don't know him, that's weird."  Schlitt then finished up being on the computer in the office, walked out of the stockroom with Anwar, clocked out and left the store . . . Kenneth Hilger was a witness to this incident . . . McHugh would like for HR to know about this issue and coach Schlitt.  McHugh stated that Schlitt has previously been reprimanded for letting her boyfriend into the back of the store.

*Id.*  The record also notes that "Anwar used to be a manager at the store."  *Id.*

### D.   Investigation

In or around January 2010, Schlitt received a telephone call from Adam Chmielewski, who had become her district manager in September 2009.  Schlitt Depo. at 181.  According to Schlitt, Chmielewski asked her if her boyfriend had been in the backroom, or if someone named Anwar had been there.  *Id.* at 181-83.[2]  Schlitt answered both questions in the negative.  She did not volunteer any information about Arnaud's visit during the call, although she stated at her deposition that she did not realize that Chmieleski was calling to investigate Arnaud's visit.  *Id.* at 182-83.

Chmielewski subsequently learned from Hilger that it was "Arnaud," not "Anwar," who had been in the back room.  Chmielewski Depo. at 148.  Chmielewski then made a second call to Schlitt.  Schlitt Depo. at 194-95.  Schlitt testified that during this second call Chmielewski was

---

[2] When asked at his deposition about the content of this initial conversation with Schlitt, Chmielewski stated, "Generally, I asked if she [had] had anyone that didn't work for the company in the stockroom."  Chmielewski Depo. at 51 (McCormick Decl. Ex. E, Dkt. No. 28-6).  He testified that he could not recall whether he asked Schlitt about a specific person being in the backroom.  *Id.*

United States District Court
Northern District of California

"more broad with his questioning, and at that point, you know, I remembered that [Arnaud] was in the back and let him know that [Arnaud] had been in the back." *Id.* Schlitt told Chmielewski that when she had learned that Arnaud was in the backroom, she had asked McCollum to remove him. Chmielewski Depo. at 51, 53. Chmielewski followed up with McCollum, who told him that she had not been working on the date in question. *Id.* at 54-55. Chmielewski then sent an email to Amy Yoakum of Human Resources stating,

> I just spoke with Marissa McCollum about the incident in question. She stated that she wasn't even [in] the store on the day the . . . incident happened. She does know about it happening because Lauren McHugh, who reported it to HR, told Marissa about it as well . . . She has lied to me twice, and she lied to you.

Oppo. Ex. 15. Chmielewski verified McCollum's statement that she had not been working on the date of the incident by reviewing her timecard. Chmielewski Depo. at 92-93.

There is no indication that any further investigation occurred after this point. Chmielewski and Yoakum decided together to terminate Schlitt for violating company policy and for dishonesty during the course of the investigation. *Id.* at 73, 81-82. At his deposition, Chmielewski identified the policy violation as "[m]ultiple instances of having a nonassociate in a nonsales area." *Id.* at 82. He identified two instances of dishonesty: "The first was [Schlitt's] denial of the incident entirely. The second was pointing to [McCollum] and putting the blame on her." *Id.*

Schlitt contends that, based on her experience, the policy against nonemployees in the back room was "selectively enforced." Oppo. at 11. She points out that "it was common practice to have, you know, new hires come in the back before they were an actual associate of the store, to turn in paperwork, et cetera." Schlitt Depo. at 185. In addition, in a letter submitted in support of Schlitt's claim for unemployment, Arnaud stated that "I only proceeded to the back because this was something I had seen other previous employees do when I was working there." Oppo. Ex. 20.

Schlitt also accuses Abercrombie of conducting a "sham investigation." Oppo. at 8-12. She highlights that:

(1) Abercrombie policy requires that an investigation "include interviews of all available relevant witnesses," Associate Handbook at CSC 000010, but Chmielewski did not interview McHugh or Arnaud, *see* Chmielewski Depo. at 65-66. Abercrombie policy also "required

United States District Court
Northern District of California

1   Yoakum and/or Chmielewski to confront Schlitt with the facts and give her an opportunity to

2   explain," Oppo. at 11, which Schlitt contends they did not do.[3]

3           (2) The Human Resources record of Chmielewski's initial investigative call to Schlitt

4   states that "he spoke with her about this incident and she said she hasn't brought her boyfriend

5   back in the store since the last incident."  Oppo. Ex. 15.  Schlitt argues that this record

6   corroborates her account of the call (i.e., that Chmielewski asked her specifically whether her

7   boyfriend or someone named Anwar had been in the back room, not whether *anyone* had been

8   back there).

9           (3) Chmielewski never asked Hilger how Arnaud came to be in the back room.

10  Chmielewski Depo. at 63.  At his deposition, Chmielewski stated that some evidence "pointed to

11  [Arnaud] being a guest of Rejina's," but he could not recall what evidence supported this

12  conclusion.  *Id.* at 69.

13          (4) When Chmielewski called Schlitt a second time and asked specifically about Arnaud

14  being in the back room, Schlitt told Chmielewski exactly what had happened, except that she

15  mistakenly identified McCollum (instead of McHugh) as the assistant manager who had notified

16  her that Arnaud was there.  *See* Oppo. at 9-10.  While Chmielewski testified that he could not

17  recall having seen the record of McHugh's January 13, 2010 report before Schlitt's termination,

18

19  _____

20  [3] In support of the existence pf an Abercrombie policy that "required Yoakum and/or Chmielewski
    to confront Schlitt with the facts and give her an opportunity to explain," Schlitt cites the
21  Associate Handbook without specifying any particular section or provision.  *See* Oppo at 11.  It is
    not clear what portion of the Associate Handbook supports such a requirement.  The section titled
22  "Responding to a Report of Policy Violation" does provide that "[u]nless immediate action is
    necessary, *the complainant* shall be given an opportunity to respond to tentative findings."
23  Associate Handbook at CSC 000010 (emphasis added).  But Schlitt was not the complainant here,
    and she identifies no similar provision regarding the person accused of the policy violation.

24  With respect to the requirement that the investigation of Schlitt's alleged policy violation "include
    interviews of all available relevant witnesses," Associate Handbook at CSC 000010, Abercrombie
25  asserts in its reply brief that no such requirement exists, because the cited provision of the
    Associate Handbook is located in a section concerning "Discrimination and Harassment," not loss
26  prevention.  *See* Reply at 11; *see also* Associate Handbook at CSC 00002 (table of contents).
    Abercrombie contends that the applicable investigative procedures for loss prevention issues are
27  limited to: (1) "reports [of loss prevention issue] will be thoroughly investigated;" (2) employees
    "are expected to fully cooperate with any such investigation;" and (3) "[f]ailure to cooperate with
28  an investigation may lead to disciplinary action, up to and including termination."  Associate
    Handbook at CSC 000031-32; Reply at 11-12.

United States District Court
Northern District of California

Yoakum appears to have seen the record before then; Schlitt argues that this means that Yoakum must have known that she was not lying when she told Chmielewski during the first call that she had asked an assistant manager to tell the person in the back room to leave. *See id.* at 10.

(5) Chmielewski testified that he could not recall whether, before terminating Schlitt, he learned that Arnaud was a former Abercrombie employee. *See* Chmielewski Depo. at 86.

### E.    Discussions and Conflicts Regarding Schlitt's Religious Accommodation

With the exception of an email sent by Schlitt to Chmielewski after the investigation of her alleged policy violation was underway,[4] neither party points to any evidence of Schlitt's religious accommodation being discussed either during the course of the investigation or at her termination. However, in her opposition brief, Schlitt identifies a number of times during the course of her employment when her refusal to work on the Sabbath was discussed or created conflicts with her superiors and other Abercrombie employees.

Schlitt states that her accommodation "did not become an issue" until she became store manager at the Santa Rosa store. Oppo. at 3. Schlitt agreed to take that position in part because she saw it as a stepping stone to obtaining a transfer back to Southern California. *See* Schlitt Depo. at 50-51. When Schlitt spoke with her district manager at the time, Tara Whiteside, about the possibility of transferring to a store in Lakewood, Whiteside told Schlitt that her scheduling constraint was "a problem," and that if she transferred to the Lakewood store, she "would have to sign something saying that [she] would work on [the] Sabbath." Schlitt Depo at 130-31. Whiteside told Schlitt that, according to the regional manager, it would probably never come to Schlitt actually having to work on the Sabbath, "so [she] should just sign [the document]," as a formality. *Id.* Schlitt refused, and Whiteside told her that the regional manager was "upset about it." *Id.* When asked at her deposition about Schlitt's desire to transfer to Southern California, Whiteside testified that "given that [Schlitt] did have a scheduling requirement, all the other managers within that store, wherever she wanted to go, would have to agree to accommodate," and that, in any event, there were no relevant openings at the time. Whiteside Depo. at 34 (Reinach

---

[4] In the email, Schlitt states that she is "beginning to feel like I am being retaliated against for my religious accommodation." Oppo. Ex. 15.

United States District Court
Northern District of California

Decl. Ex. J, Dkt. No. 31-3); *see also id.* at 38 ("So like if [Schlitt] wanted to go down and be a store manager, and she couldn't have followed the . . . mandatory schedule, then like all the other assistants in the store would have had to have been willing to . . . maybe have to work on their day off and accommodate her . . . schedule."). Schlitt was not transferred to Southern California.[5]

In May 2009, there was a Saturday (May 23, 2009) that all or nearly all assistant managers at the Santa Rosa store wanted off. Schlitt Depo. at 88. Schlitt had spoken with Whiteside about the scheduling issue, and Whiteside had said that she would provide a "borrowed manager" for the day. *Id.* But when Schlitt called Whiteside to confirm this plan, Whiteside said that she was no longer going to provide the help. *Id.* at 89. She asked Schlitt to work the Saturday instead. *Id.* Schlitt refused. *Id.* Whiteside responded that the store would have to be closed for the day if Schlitt would not work it. *Id.*

On May 13, 2009, Schlitt called Human Resources about the scheduling conflict. *Id.* According to the Human Resources record from the incident, Schlitt called at 2:39 p.m. and stated that Whiteside had scheduled her to work on May 23, 2009 and had told her that she would have to work on the Sabbath in the future. Oppo. Ex. 16. Schlitt also stated that this was unfair given that her accommodation had been approved when she was hired. *Id.*

The same Human Resources record includes a series of four communications regarding Schlitt and her accommodation. The first is an email time-stamped May 13, 2009 at 12:58 p.m. and apparently sent by Whiteside to Angela Golden of Human Resources. The email states:

> Rajina is the [store manager] I inherited with that scheduling issue. Next Saturday two managers need it off for graduations. I told her borrowed help is limited due to everyone on vacation. Her managers that wanted time off were concerned because they have accommodated her schedule and feel she should do the same for them this one time. Since the business needs this, am I ok to tell her she has to work? Since the other managers are concerned. Thanks.

*Id.*

The second is a call between Golden and Schlitt on May 18, 2009 at 2:30 p.m. According to the notes from the call, Golden "explained . . . that we will do our best to accommodate her, but

---

[5] As noted above, I do not address in this Order whether Schlitt may bring claims based on Abercrombie's denial of her transfer request.

United States District Court
Northern District of California

that she cannot be guaranteed the time off . . . due to the needs of the business," and that "we may have a Saturday here or there that [she] might need to work." *Id.* The notes also state, "[T]he [assistant manager] is not happy about it, but she is covering for her." *Id.* This appears to be a reference to McHugh, who ultimately agreed to work on the contested Saturday (and who reported Schlitt's alleged policy violation to Human Resources).

The third is a call between Golden and Whiteside on May 18, 2009 at 2:48 p.m., approximately 18 minutes after the call between Golden and Schlitt. The notes from the call state:

> Whiteside said that when she inherited the store she was told that Schlitt had every Saturday off, at which point Whiteside communicated that she will do her best to allow it, but can't say that it will always be allowed. Whiteside did discuss the needs of the business with Schlitt then, and stressed that it cannot be guaranteed. Whiteside said that she has been receiving complaints from [assistant managers] recently because they don't think it is fair that they have to cover every Saturday. Whiteside will monitor the situation.

*Id.*

The fourth is a call between Yoakum and Whiteside on June 10, 2009. The notes from the call indicate that another scheduling conflict, similar to the one over May 23, 2009, occurred in June of that year:

> Per Whiteside, both [assistant managers] need off on June 23rd and Schlitt will need to close.[6] Told her that original decision by [Golden] regarding undue burden would apply in this situation. If there is no one willing or able to work the Saturday shift, then she will need to work.

*Id.* (footnote added); *see also* Schlitt Depo. at 205-06.

Another Human Resources record indicates that McHugh called Human Resources on May 18, 2009 to complain about Schlitt's accommodation in connection with the May 23, 2009 scheduling conflict. Oppo. Ex. 31. The notes from the call state:

> [McHugh] would like to complain about the religious accommodation . . . allowing [Schlitt to not] have to work Saturdays due to her religion.

> McHugh stated that she is being forced to work on a Saturday that she had previously been approved to take off . . . McHugh is upset

---

[6] It appears that the June 23rd date, a Tuesday, is a typographical error in the Human Resources record; June 13th, 20th and 27th were Saturdays in 2009.

10

> about it and just wanted her frustration documented. She advised me that the [district manager] is aware of her frustration, and that [the district manager] told her that if she was frustrated with the situation to call HR and let us know. Additionally, McHugh stated that she believes Schlitt is acting like nobody cares that Schlitt gets Saturdays off, but they do. McHugh stated that the other managers are being negatively affected by Schlitt's inflexibility, implying there was undue hardship put on these . . . managers.

*Id.*

In line with these notes, McCollum testified at her deposition that "there was sort of a general negative feeling around the subject [of Schlitt not working Saturdays], because Saturdays were our busiest days, and our store manager . . . was never there." McCollum Depo. at 26 (Reinach Decl. Ex. K, Dkt. No. 31-3). McCollum stated that Schlitt's consistent absence on Saturdays "sometimes led to frustration," in particular among employees who "were perhaps denied time off or were less flexible about the time they were denied off." *Id.* She also stated that employees felt that it was "unfair," and that "particularly around the holidays, at our busiest times, or back to school, it bec[ame] a burden. Everybody just needed to work that much harder." *Id.* at 50.

As noted above, Chmielewski replaced Whiteside as the district manager in September 2009. *See* Chmielewski Depo. at 26-27. Schlitt testified that in fall 2009 she asked Chmielewski on "multiple occasions" whether he would conduct the required weekly Friday evening conference calls among store managers at an earlier time, or whether she could sign off early from the calls, so that they would not extend into the Sabbath. *See* Schlitt Depo. at 67, 72-74, 108-09. Schlitt asserts that Chmielewski did not accommodate her requests, occasionally forcing her to work into the Sabbath. *See id.* She also testified that she "may have worked like an overnight shift where, you know, I started, you know, right on the cusp of the sun going down on a Saturday." *Id.* at 72.

## II.   PROCEDURAL BACKGROUND

Schlitt initiated this action in the Superior Court of the State of California, County of Sonoma, on February 20, 2015. Dkt. No. 1. Abercrombie removed the case to federal court on March 25, 2015, and then filed this motion for summary judgment on February 29, 2016. Dkt. No. 28. I heard argument from the parties on May 4, 2016. Dkt. No. 35.

**LEGAL STANDARD**

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material where it could affect the outcome of the case.  *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing that a factual issue remains for trial.  *Id.*  The nonmoving party may not rest on mere allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the record" demonstrating the presence of a factual dispute.  Fed. R. Civ. P. 56(c)(1)(A).  The nonmoving party need not show that the issue will be conclusively resolved in its favor.  *See Anderson*, 477 U.S. at 248-49.  All that is required is the identification of sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial."  *Id.* (internal quotation marks omitted).  If the nonmoving party cannot produce such evidence, the movant "is entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case."  *Celotex*, 477 U.S. at 323.

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise a genuine dispute of material fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738-39 (9th Cir. 1979).

**DISCUSSION**

## I.      DISCRIMINATION CLAIMS

### A.      Legal Framework

Title VII prohibits employment discrimination on the basis of a protected trait.  Under 42 U.S.C. § 2000e-2(a)(1), the provision at issue here, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  This is often referred to as Title VII's "disparate treatment" provision.  *See, e.g., E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015).  Title VII also includes a "disparate impact" provision, 42 U.S.C. § 2000e-2(a)(2), not at issue in this case.

Title VII defines "religion" to "includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate [the] religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).  Recently, in another religious discrimination case brought against Abercrombie, the Supreme Court clarified that under this definition of "religion," an individual's "religious practice," just like his religious belief, is a protected trait "that cannot be accorded disparate treatment and must be accommodated" unless the employer demonstrates undue hardship. *Abercrombie*, 135 S. Ct. at 2034.  In the absence of such a demonstration, a plaintiff may prove religious discrimination by "show[ing] that his need for an accommodation was a motivating factor in the employer's decision." *Id.* at 2032.[7]

Disparate treatment claims under Title VII are governed by a three-part burden-shifting framework. *See E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009); *Cordova v. State*

---

[7] A plaintiff may prove unlawful discrimination under Title VII by showing that the protected trait was "a motivating factor for any employment practice."  42 U.S.C § 2000e-2(m).  This is the case even where the evidence shows that the employment practice was also motivated by other, legitimate factors. *See id.*  Under this standard of causation, "[a]n employer may be held liable under Title VII even if it had a legitimate reason for its employment decision, as long as an illegitimate reason was a motivating factor in the decision." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1040 (9th Cir. 2005).

United States District Court
Northern District of California

*Farm Ins. Companies*, 124 F.3d 1145, 1148 (9th Cir. 1997).  First, a plaintiff "must . . . establish a prima facie case . . . by offering evidence that gives rise to an inference of unlawful discrimination."  *Boeing*, 577 F.3d at 1049 (internal quotation marks and alterations omitted).  A plaintiff may do this either by satisfying the four-part test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[8] or by presenting direct or circumstantial evidence indicating that the challenged action was based on a protected trait.[9]  *See Boeing*, 577 F.3d at 1049; *Dominguez-Curry*, 424 F.3d at 1037; *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985).

Second, if the plaintiff establishes a prima facie case, "the burden of production – but not persuasion – then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002); *accord Boeing*, 577 F.3d at 1049.

---

[8] In *McDonnell*, the Supreme Court explained that

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
>
> [ . . . ]
>
> The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations.

411 U.S. at 802, 802 n.13.

[9] The "direct or circumstantial evidence" approach has also been characterized as a wholly separate way for a plaintiff to prove a disparate treatment case (as opposed to an alternative means of establishing a prima facie case under the burden-shifting framework).  *See, e.g., Dominguez-Curry*, 424 F.3d at 1037; *McGinest*, 360 F.3d at 1122.  This distinction does not particularly matter here, because under either conceptualization, once the defendant responds to the plaintiff's initial showing with some legitimate, nondiscriminatory reason for the challenged action, the plaintiff "must produce some evidence [to] counter [the defendant's] explanation."  *McGinest*, 360 F.3d at 1123; *see also Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008).  Because the parties frame their analysis in terms of the burden-shifting framework, I do the same in this Order.

United States District Court
Northern District of California

Finally, if the employer presents some legitimate, nondiscriminatory reason, the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the [challenged action]." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  "This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Id.*  The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*  When a plaintiff relies on circumstantial evidence to show that the employer's proffered explanation is pretextual, that evidence must be "both specific and substantial," *Villiarimo*, 281 F.3d at 1062; *accord Boeing*, 577 F.3d at 1049, meaning simply that the evidence must be "sufficient to raise a genuine issue of material fact under Rule 56(c)," *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006).

Like Title VII, FEHA prohibits employment discrimination on the basis of "religious creed," Cal. Gov. Code § 12940(a), and defines "religious creed" to "include all aspects of religious belief, observance, and practice, including religious dress and grooming practices," Cal. Gov. Code § 12926(q).  FEHA also includes a separate provision specifically prohibiting employment discrimination

> because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue

1          hardship[10] . . . on the conduct of the business of the employer . . .
Religious belief or observance, as used in this section, includes, but
2          is not limited to, observance of a Sabbath or other religious holy day
or days.

3   Cal. Govt. Code § 12940(*l*) (footnote added).[11]   Courts apply the same three-part burden-shifting

4   framework described above to disparate treatment claims under FEHA.  *See Metoyer v. Chassman*,

5   504 F.3d 919, 941 (9th Cir. 2007); *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354-56 (2000).  The

6   parties do not dispute that, for the purposes of Abercrombie's motion for summary judgment,

7   Schlitt's Title VII and FEHA discrimination claims rise and fall together.

8        **B.**    **Analysis**

9          Abercrombie does not argue that Schlitt's observance of the Sabbath fails to qualify as a

10   protected religious practice, nor that reasonably accommodating this religious practice caused

11   undue hardship.  Rather, Abercrombie contends that it is entitled to summary judgment on

12   Schlitt's discrimination claims because: (1) Schlitt has not produced sufficient evidence of

13   discriminatory motive to establish a prima facie case; and (2) even assuming that Schlitt has

14   ――――――――――――――――

15   [10] The term "undue hardship" is defined as

16          an action requiring significant difficulty or expense, when
considered in light of the following factors:

17          (1) The nature and cost of the accommodation needed.

18          (2) The overall financial resources of the facilities involved in the
provision of the reasonable accommodations, the number of persons
19          employed at the facility, and the effect on expenses and resources or
the impact otherwise of these accommodations upon the operation of
20          the facility.

21          (3) The overall financial resources of the covered entity, the overall
size of the business of a covered entity with respect to the number of
22          employees, and the number, type, and location of its facilities.

23          (4) The type of operations, including the composition, structure, and
functions of the workforce of the entity.
24

25          (5) The geographic separateness or administrative or fiscal
relationship of the facility or facilities.

26   Cal. Govt. Code § 12926(u).

27   [11] It is not clear from Schlitt's complaint or opposition brief whether she means to bring her FEHA
religious discrimination claim under section 12940(a), section 12940(*l*), or both.  Because it is not
28   necessary to resolve this issue to decide this motion, I do not address it here.

United States District Court
Northern District of California

1  established a prima facie case, she has not shown that Abercrombie's claimed basis for

2  terminating her – i.e., her alleged policy violation and dishonesty during the investigation – was

3  pretextual.  *See* Mot. at 8-11; Reply at 2-12 (Dkt. No. 34).

4         I am not convinced by either of these arguments.  Abercrombie's principal attack on

5  Schlitt's prima facie case is that Schlitt has not produced sufficient evidence that Abercrombie

6  treated similarly situated individuals more favorably.  *See* Mot. at 8, 8 n.7; Reply at 2.  This is

7  essentially an argument that Schlitt must establish a prima facie case of disparate treatment by

8  means of the four-part *McDonnell Douglas* test.  The Ninth Circuit has repeatedly held that a

9  plaintiff may respond to a motion for summary judgment in a Title VII case *either* by satisfying

10  the four-part *McDonnell Douglas* test, *or* by "introducing other sufficient evidence – direct or

11  circumstantial – of discriminatory intent."  *McGinest*, 360 F.3d at 1122 (internal quotation marks

12  omitted); *see also Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158

13  (9th Cir. 2013) ("Our cases clearly establish that plaintiffs who allege disparate treatment under

14  statutory anti-discrimination laws need not demonstrate the existence of a similarly situated entity

15  who or which was treated better than the plaintiffs in order to prevail."); *Boeing*, 577 F.3d at 1049;

16  *Budnick*, 518 F.3d at 1114; *Dominguez-Curry*, 424 F.3d at 1037; *Cordova*, 124 F.3d at 1148;

17  *Lowe*, 775 F.2d at 1009.  Accordingly, this argument fails, whether or not Abercrombie is correct

18  that Schlitt has not produced sufficient evidence that Abercrombie treated similarly situated

19  individuals more favorably.

20         Abercrombie also attacks Schlitt's prima facie case on the ground that her evidence of

21  discriminatory motive amounts to an attempt to introduce a new and unpleaded theory of liability

22  based on Chmielewski's alleged failure to accommodate her requests to modify the weekly

23  conference call schedule.  *See* Reply at 2-4.  I agree that Schlitt cannot raise this alleged failure to

24  accommodate as a theory of liability given that she did not plead it.[12]  *See La Asociacion de*

25  *Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) ("[A]

26

27  [12] Schlitt may still introduce the alleged failure to accommodate as evidence to support her
   pleaded theories of liability, although I note that she specifically asserts in her complaint that

28  "[t]hroughout her employment, she *never* worked during Sabbath hours."  Compl. ¶ 17 (emphasis
   added).

United States District Court
Northern District of California

17

1    party] may not effectively amend its complaint by raising a new theory . . . in its response to a

2    motion for summary judgment."); *Pac. Life Ins. Co. v. Gordillo*, No. 14-cv-03713-WHO, 2015

3    WL 9303986, at *6 (N.D. Cal. Dec. 22, 2015).  But Schlitt's prima facie case rests on the theory

4    that she was terminated because of her need for a religious accommodation, a theory that she

5    clearly did plead and that she presented considerable evidence to support.  This includes the

6    evidence that in the months before her termination her observance of the Sabbath caused

7    significant conflicts both with other employees at the Santa Rosa store and with her superiors, and

8    that as a result of these conflicts Abercrombie decided to stop accommodating her religious

9    practice on the ground that it was an "undue burden" (an issue Abercrombie does not raise in its

10   motion).  This is sufficient to give rise to an inference of unlawful discrimination.

11         With respect to pretext, Abercrombie contends that Schlitt is relying on circumstantial

12   evidence to show that her alleged policy violation and dishonesty were a pretextual basis for her

13   termination, and that her evidence in support of this theory does not rise to the level of "specific

14   and substantial." *Villiarimo*, 281 F.3d at 1062.  I disagree again.  The evidence of significant

15   conflicts regarding Schlitt's observance of the Sabbath in the months before her termination and

16   Abercrombie's decision to stop accommodating her religious practice, in particular when

17   combined with the circumstances of the investigation into her alleged policy violation, amounts to

18   specific and substantial evidence sufficient to allow a jury to find intentional discrimination in this

19   case.

20         Abercrombie's principal argument to the contrary is that the evidence shows that it had a

21   good faith and reasonable belief that Schlitt committed a policy violation and then lied during the

22   investigation.  *See* Mot. at 8-10; Reply at 6-7.  In the same vein, Abercrombie asserts that its

23   investigation was "thorough," "accurate," and "fully compli[ant]" with company policy.  *See*

24   Reply at 7-9, 11-12.  At best, however, these points merely establish that Abercrombie had one

25

26

27

28

United States District Court
Northern District of California

18

United States District Court
Northern District of California

permissible motive for terminating Schlitt.[13]  In light of the other evidence on record, they do not

establish as a matter of law that Schlitt's termination was not also motivated by her need for an

accommodation.  *See Dominguez-Curry*, 424 F.3d at 1040-42.

Abercrombie also challenges Schlitt's showing of pretext on the grounds that (1) there is

"no evidence" that Schlitt's accommodation "created a problem" – for example, when asked at her

deposition whether she "sens[ed] any frustration or hostility with respect to [her] Sabbath

accommodation" within the Santa Rosa store, Schlitt answered, "Not really," Schlitt Depo. at 218;

Reply at 9; (2) the scheduling conflict over Saturday, May 23, 2009 occurred approximately seven

months before Schlitt was terminated, Mot. at 10; (3) Schlitt cannot rely on the alleged circulation

of rumors about her leaving Abercrombie before she was terminated, Chmielewski's subsequent

discriminatory termination of another employee, or the findings of the California Unemployment

Insurance Appeals Board, because none of this evidence is admissible at trial, Reply at 10-11.

I assume for the purposes of this motion that the challenged evidence is inadmissible, but

that evidence is peripheral at best and is not material to Schlitt's showing of unlawful

discrimination.  Abercrombie's attempts to minimize the difficulties created by Schlitt's

accommodation are also unconvincing.  There is substantial evidence indicating that her

observance of the Sabbath created significant conflicts with other employees at the Santa Rosa

store – particularly McHugh – and with her superiors.  That some of these conflicts manifested

approximately seven months before Schlitt's termination does not preclude a jury from reasonably

relying on them to find discriminatory intent.  Further, Schlitt's testimony at her deposition that

---

[13] Moreover, Abercrombie's evidence in support of its stated reasons for terminating Schlitt is not as strong as it contends.  Schlitt's evidence of irregularities in the investigation is relatively weak. But when the evidence of irregularities is viewed in combination with the significant conflicts regarding Schlitt's accommodation and Abercrombie's reaction to those conflicts, whether Abercrombie "honestly believe[d] its proffered reasons" for Schlitt's termination becomes a question for the jury.  *Villiarimo*, 281 F.3d at 1063.  This conclusion is bolstered by Abercrombie's shifting characterization in its briefing of Schlitt's alleged policy violation, from (1) allowing Arnaud into the back room herself to (2) failing to report the incident or to "disciplin[e] McHugh or McCollum for breaching loss prevention policies and insubordination for refusing to remove Arnaud as Schlitt claims she instructed them to do."  Reply at 8.  Abercrombie has not identified any evidence of the latter explanation being proffered at the time of Schlitt's termination; at his deposition, Chmielewski identified the policy violation as "[m]ultiple instances of having a nonassociate in a non-sales area," not as failing to adequately enforce this rule.  *See* Chmielewski Depo. at 82.

she did "not really" sense any frustration or hostility within the store over her accommodation was immediately preceded by her identifying a conversation with McHugh about the May 23, 2009 scheduling conflict as an instance when an assistant manager "expressed frustration" to her personally about her accommodation.  *See* Schlitt Depo. at 217-18.  Moreover, Schlitt only answered that she did "not really" sense any frustration or hostility over her accommodation *within the store*; her answer did not purport to address her superiors' reaction to the accommodation.  Nor did her answer purport to address whether, objectively speaking, there was any frustration or hostility within the store; she was only speaking to what she personally "sense[d]."  *Id.* at 218.  In contrast with Schlitt's subjective recollection, McCollum testified that Schlitt's scheduling constraint engendered "a general negative feeling" and "frustration" among other employees at the store.  *See* McCollum Depo. at 26, 50; *see also* Oppo. Ex. 31.

Abercrombie may certainly argue to the jury that it had a good faith and reasonable belief in its proffered reasons for terminating Schlitt.  But there are material facts in dispute, and Abercrombie is not entitled to summary judgment on Schlitt's discrimination claims.

## II.    RETALIATION CLAIMS

"Title VII prohibits retaliation against an employee for opposing unlawful discrimination." *McGinest*, 360 F.3d at 1124 (citing 42 U.S.C. § 2000e-3(a)).[14]  "Like discrimination, retaliation may be shown using the *McDonnell Douglas* burden-shifting framework."  *Id.*  To establish a prima facie case of retaliation, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  In contrast with a Title VII claim for disparate

_____

[14] Under 42 U.S.C. § 2000e-3(a), it is unlawful

> for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

United States District Court
Northern District of California

1   treatment, which requires only a showing that the protected trait "was a motivating factor" for the

2   challenged action, 42 U.S.C § 2000e-2(m), a Title VII claim for retaliation requires a showing of

3   but-for causation, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  That is,

4   the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged

5   adverse action by the employer." *Id.*

6        The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims

7   under FEHA.  *Brooks*, 229 F.3d at 928.  The basic requirements for a prima facie case of FEHA

8   retaliation are the same as those for a prima facie case of Title VII retaliation.[15]  *See Strother v. S.*

9   *California Permanente Med. Grp.*, 79 F.3d 859, 868 (9th Cir. 1996).  However, in contrast with

10  retaliation claims under Title VII, the requisite causal link for retaliation claims under FEHA is not

11  but-for causation, but rather "a substantial motivating factor."  *Alamo v. Practice Mgmt. Info.*

12  *Corp.*, 219 Cal. App. 4th 466, 469-70 (2013).

13       Schlitt asserts that she engaged in protected activity when she (1) repeatedly sought

14  religious accommodation, including by refusing to sign the document stating that she would work

15  on the Sabbath, and by refusing to work on May 23, 2009; and (2) informed Chmielewski, a week

16  before her termination, that she was being retaliated against because of her religious

17  accommodation.  Compl. ¶¶ 83-86 (FEHA), 106-09 (Title VII).  The one adverse employment

18  action Smith identifies in support of her retaliation claims is her termination.  *See id.* ¶¶ 87

19  (FEHA), 110 (Title VII).

20       Abercrombie seeks summary judgment on the retaliation claims on the ground that Schlitt

21  has not shown a causal link between her protected activity and her termination and thus cannot

22  establish either a prima facie case or pretext.  *See* Mot. at 11-13; Reply at 4-6 (prima facie case),

23  6-12 (pretext).  I am skeptical that Schlitt has presented sufficient evidence of a causal link

24  between each alleged instance of protected activity and her termination.  Nevertheless, for the

25  reasons discussed in the preceding section of this Order, I am satisfied that the evidence is

26

27  [15] Similar to 42 U.S.C. § 2000e-3(a), California Government Code § 12940(h) prohibits
    employment discrimination "against any person because the person has opposed any practices
28  forbidden under this part or because the person has filed a complaint, testified, or assisted in any
    proceeding under this part."  Cal. Govt. Code § 12940(h).

sufficient to create a triable issue on the causal link at least between Schlitt's repeated requests for accommodation and her termination. Abercrombie is not entitled to summary judgment on Schlitt's retaliation claims.

## III.   LACHES

Finally, Abercrombie moves for summary judgment on the ground that Schlitt's claims are barred by laches due to the amount of time between when she initiated administrative proceedings (July 14, 2010) and when she filed this lawsuit (February 20, 2015). *See* Mot. at 13-16. Abercrombie accuses Schlitt of going "months, and even *years*, without making contact with the EEOC," and of failing to "reques[t] a right to sue letter from the EEOC shortly after filing her charge, or when the charge began to languish without any activity." *Id.* at 14-15 (emphasis in original); *see also* Reply at 12-13. The longest break in communication identified by Abercrombie is from September 29, 2010 to February 7, 2012, a break of just over 16 months. *See* Mot. at 14-15; McCormick Decl. Ex. F (Dkt. No. 28-7).

Schlitt's attorney, Alan Reinach, submits a declaration stating that throughout the course of the administrative proceedings he "was in frequent contact with either EEOC investigators or EEOC attorneys, seeking to get the investigation completed," including by communicating with Scott Doughtie, the EEOC supervisor of investigations, and Cindy O'Hara, an EEOC staff attorney. Reinach Decl. ¶¶ 6-12 (Dkt. No. 31-1). Reinach states that Doughtie informed him that after the case's initial investigator left the EEOC, it took "some period of months" for the case to be reassigned to a new investigator, who proved ineffective, and then another period of "many months" for the case to be reassigned to the investigator who ultimately conducted a fact finding hearing. *Id.* ¶ 9. Abercrombie submits no competing evidence in its reply brief.

"Laches is an equitable time limitation on a party's right to bring suit." *Boone v. Mech. Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979). To establish laches, the defendant must show both (1) "an unexcused or unreasonable delay by the plaintiff," and (2) prejudice. *Brown v. Cont'l Can Co.*, 765 F.2d 810, 814 (9th Cir. 1985). In *Boone*, 609 F.2d 956, the Ninth Circuit held that the plaintiff's Title VII action was barred where

United States District Court
Northern District of California

22

> [t]he EEOC informed [plaintiff] on several occasions that he could
> have a right-to-sue letter and institute a civil action. He was advised
> that the EEOC would assist him in bringing an action in the courts.
> Nevertheless, [plaintiff] repeatedly refused, choosing instead to
> sleep on his rights. [Plaintiff] offered no evidence from which this
> court or the court below could even infer an excuse for his seven-
> year delay.

*Id.* at 959. The court emphasized that it was "stat[ing] the exception and not the general rule," and that "[n]ormally, it may be reasonable for an aggrieved employee to allow the EEOC to retain jurisdiction over a Title VII action." *Id.* at 960.

By contrast, in *Brown*, 765 F.2d 810, the Ninth Circuit rejected the defendant's reliance on *Boone* where the plaintiff "did not deliberately delay seeking a right-to-sue letter." *Id.* at 815. The court stated: "This circuit has recognized that EEOC delays are not to be charged against private plaintiffs and that complainants are not required to terminate the administrative process by requesting a notice of right-to-sue. Ordinarily, if the EEOC retains control over a charge, a private plaintiff will not be charged with its mistakes." *Id.* (internal quotation marks and citations omitted).

This case clearly falls under *Brown*, not *Boone*. It is true that a great deal of time passed while the EEOC investigated this matter, but that cannot be charged to Schlitt. Abercrombie has not established laches as a matter of law and is not entitled to summary judgment on this ground.

## CONCLUSION

Abercrombie's motion for summary judgment is DENIED.

**IT IS SO ORDERED**.

Dated: May 13, 2016

WILLIAM H. ORRICK
United States District Judge